## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Terrance Bradley, Jr.,

                Plaintiff,        Case No. 21-cv-10923

v.                           Judith E. Levy
                               United States District Judge
United States Steel Corporation,

                Defendant.    Mag. Judge David R. Grand

_____/

## OPINION AND ORDER GRANTING
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [22]</u>

Plaintiff Terrence[1] Bradley, Jr. brings this employment discrimination case against Defendant United States Steel Corporation following a workplace injury. Plaintiff's claims include discrimination, retaliation, and failure to accommodate. He alleges violations of the Americans with Disabilities Act (ADA), the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), Title VII, the Elliott-Larsen Civil Rights Act (ELCRA), and the Michigan Worker's Disability Compensation Act (WDCA).

---

[1] Plaintiff's first name is written as "Terrance" on the docket, but he indicated during his deposition that it is actually "Terrence." (ECF No. 25-3, PageID.478.)

Before the Court is Defendant's motion for summary judgment. (ECF No. 22.) The motion is fully briefed. (ECF Nos. 25, 27.) On November 21, 2022, the Court held a hearing on the motion and heard oral argument. For the reasons set forth below, Defendant's motion is GRANTED.

## I.   Background

### A. Plaintiff's Employment with Defendant

Plaintiff is an African-American individual who was hired by Defendant in December 2013.[2] (*See* ECF No. 1, PageID.2; ECF No. 25-3, PageID.477, 504; ECF No. 25-70, PageID.874.) He is currently employed by Defendant. (*See* ECF No. 25-3, PageID.505.)

Plaintiff works in Defendant's tandem mill in Ecorse, Michigan. (*See* ECF No. 22, PageID.139.) At the tandem mill, "large metal coils are processed [through five stands[3]] . . . to bring the coil to the proper

---

[2] The complaint states that Plaintiff "began his employment with Defendant on or about December 12, 2013." (ECF No. 1, PageID.2.) But during his deposition, Plaintiff agreed that he was hired by Defendant "on or about December 9, 2013." (ECF No. 25-3, PageID.504; *see* ECF No. 25-70, PageID.874 (stating that Plaintiff "began working for [Defendant] on December 9, 2013").)

[3] Defendant indicates that "[e]ach stand consists of a set of rolls [resembling rolling pins] stacked on each other. As the metal coils pass through the stands, the

2

gauge and to put a finish on the metal's surface, in accordance with customers' orders." (*Id.*) Plaintiff first held an entry-level position, but his position since 2016 is "operating technician level one." (ECF No. 25-3, PageID.504–505; *see* ECF No. 1, PageID.2.) Plaintiff's position is governed by a collective bargaining agreement (CBA). (*See* ECF No. 22, PageID.139–140; ECF No. 25-3, PageID.505.) Under the "operating technician level one" position, Plaintiff is qualified to do a number of jobs. (*See* ECF No. 25-3, PageID.508; ECF No. 25-4, PageID.560.) Prior to the date of his injury, he was working as a finisher.[4] (*See id.*)

### B. Plaintiff's Injury on October 4, 2019

On October 4, 2019, Plaintiff was an "extra person" at the mill and was told to train as an assistant roller "instead of finish." (ECF No. 25-3, PageID.506.) Assistant roller "is the second highest job" at the

---

coil is reduced down to the gauge of the stand until the metal coil gets to the final stand where the finish is applied." (ECF No. 22, PageID.139.)

[4] The finisher's "job is to inspect the steel, [to] check for . . . any defects . . . to make sure [Defendant is] making . . . prime quality steel." (ECF No. 25-4, PageID.544.) A finisher works twenty or thirty feet away from the mill floor. (*See* ECF No. 25-7, PageID.614.)

tandem mill.[5] (*Id.* at PageID.484, 533; *see* ECF No. 25-4, PageID.550, 559; ECF No. 25-7, PageID.614.) Plaintiff's trainer was William Bryant, who has been an assistant roller for at least seven to eight years. (*See* ECF No. 25-3, PageID.484; ECF No. 25-4, PageID.550; ECF No. 25-9, PageID.637, 639.)

During Plaintiff's training, a damaged wood board prevented a metal coil from going through the mill's second stand. (*See* ECF No. 25-3, PageID.508; ECF No. 25-9, PageID.639.) Plaintiff stopped the mill, put certain "safety pins in place," and notified the roller,[6] Todd Ellison, who made an adjustment to the first stand. (ECF No. 25-3, PageID.508; ECF No. 25-4, PageID.548, 559.) Plaintiff backed up the metal coil and removed the damaged board. (*See* ECF No. 25-3, PageID.508; ECF No.

---

[5] The assistant roller "oversees the whole operation of the line," which includes supervising other mill workers, feeding the metal coil through the five stands, ensuring the coil goes straight through each stand, and adjusting certain controls to get the coil to the proper shape. (ECF No. 25-5, PageID.568.) The assistant roller is "on the floor actually walking along the mill." (ECF No. 25-7, PageID.606.)

[6] At the mill, the roller is "the head operator." (ECF No. 25-4, PageID.544.) That person controls the rolls at each stand "so [the steel] can meet gauge." (ECF No. 25-3, PageID.534.) The roller has "screens [in the roller's pulpit] that [show certain areas of the mill and] watch[es] as [the assistant roller is] sticking each stand. So . . . the roller is up in the pulpit watching, making sure everything is done correctly." (ECF No. 25-7, PageID.606.) From the pulpit, the roller can see the entire "length of the mill." (*Id.*)

4

25-4, PageID.548.) As Plaintiff was installing a new board, the mill started to run. (*See id.*) The front end of the coil pressed into Plaintiff's back and then cut into his leg before hitting the ground. (*See* ECF No. 25-3, PageID.508–510, 528; ECF No. 25-4, PageID.548, 552.) Plaintiff stated that the mill continued to run, so the steel "was cobbled up to the ceiling because it ha[d] nowhere to go and that's when it pushed me . . . into the guide box which consists of metal clamps." (ECF No. 25-3, PageID.510.) At that point, Plaintiff was able to grab his radio and screamed for help. (*See id.*) Bryant came over, and the steel was "reverse[d]." (*Id.*)

Plaintiff was carried out of the mill and was taken by ambulance to Henry Ford Health System in Wyandotte. (*See id.*; ECF No. 25-12, PageID.668.) Plaintiff was injured in "the area right behind where [his] knee bends." (ECF No. 25-3, PageID.524.) At the hospital, Plaintiff's laceration was "stitch[ed] up," and he received no other treatment at that time. (*Id.* at PageID.510–511.) Plaintiff's treating physician, Dr. Furrukh Jabbar, noted that Plaintiff had "a superficial laceration involving skin and fat, no injury to muscles, tendons or neurovascular issues, will close at bedside." (*Id.* at PageID.525; ECF No. 22-12,

5

PageID.320, 322.) Plaintiff stayed at the hospital for two nights (October 4th and 5th) for "[o]bservation." (ECF No. 25-3, PageID.511.) During his deposition, Plaintiff did not remember the reason he was under observation. (*See id.*) He testified that his discharge papers instructed him to "stay home for [his] injuries." (*Id.* at PageID.487.) But he never saw anything in writing from Defendant saying that he would be able to heal from his injuries at home. (*See id.*)

After Plaintiff was released from the hospital, he was referred to Dr. Michael Scott. (*See id.* at PageID.511; ECF Nos. 25-11, 25-12, 25-13.) No one from Defendant's management or medical department prevented Plaintiff from attending his appointments with Dr. Scott. (*See* ECF No. 25-3, PageID.523.)

Plaintiff acknowledged during his deposition that a workers' compensation claim was opened on his behalf, but he could not recall whether he or "the company" completed the necessary paperwork. (*Id.* at PageID.512.)

## C. Plaintiff's Visits to Defendant's Medical Department on October 7 and 8, 2019

Plaintiff did not work on October 5, 2019. (*See id.* at PageID.511.) He first "report[ed] to medical . . . at the plant" on October 7, 2019. (*Id.*)

6

According to Plaintiff, the doctor there—Dr. Vinaya Vallabhaneni—"made observations" about Plaintiff's injury, "tried to have [him] fill out [a] statement," and "took [his] medicine." (*Id.*; *see id.* at PageID.513; ECF No. 1, PageID.4.) Plaintiff testified that he asked for his medication because he was in pain and that Dr. Vallabhaneni tried to get a statement from Plaintiff when his medication was sitting on the table. (*See* ECF No. 25-3, PageID.485.) Plaintiff testified that "after going back and forth [Dr. Vallabhaneni] decided to give me my meds and told me they would get a statement from me at a later date." (*Id.*) Plaintiff then took the medication in front of Dr. Vallabhaneni—without providing a statement—after Dr. Vallabhaneni "released" the medication to him. (*Id.* at PageID.486.) A Clinic Visit Progress Note dated October 7, 2019 reflects that Plaintiff "took the pill in [Dr. Vallabhaneni's] presence, against [his] advice, to hold for few minutes only." (ECF No. 22-13, PageID.324; ECF No. 25-17, PageID.690.)

The October 7, 2019 progress note states that Dr. Vallabhaneni "advised [Plaintiff] to report to clinic every day for dressing change," and it specifies a follow-up date of "10/8/19." (ECF No. 22-13, PageID.325–326; ECF No. 25-17, PageID.691–692.) The progress note

7

also states that Plaintiff is "[m]edically available to [perform] . . . work from 10/7/19, with the following restrictions---Sit down job only in clean environment---Training center[7] for 4 hours/day. But he can get up and walk as tolerated." (ECF No. 22-13, PageID.325–326; ECF No. 25-17, PageID.691–692.) Yet after Plaintiff's medical visit on October 7, 2019, Plaintiff "went back home"; he did not go to work at the training center. (ECF No. 25-3, PageID.511.)

Plaintiff again saw Dr. Vallabhaneni on October 8, 2019. (*See* ECF No. 22-14, PageID.328; ECF No. 25-18, PageID.695.) A progress note from this visit contains a follow-up date of "10/9/19, for dressing change." (ECF No. 25-18, PageID.695.) It states that Plaintiff is "[m]edically available to restricted work--sit down job only, in clean environment , [sic] for 4 hours/day. Transportation is already provided." (*Id.*) Similar information appears in a Duty Disposition Letter signed by Dr. Vallabhaneni that has a "Treatment Date" of "10/08/2019." (ECF No. 22-14, PageID.328.) The letter indicates that the "Follow Up Appointment" is on "10/09/2019" and that Plaintiff's restrictions are:

---

[7] The training center is where Defendant conducts trainings and orientations, such as "safety orientations [and classes], . . . career progression trainings, . . . [and] mechanical and electrical learner programs." (ECF No. 25-4, PageID.552.)

8

"Work at the Training Center, Clean work area, Sit down job only. May ambulate as tolerated." (*Id.*)

## D. Plaintiff's Failure to Report to the Medical Department and the Training Center

Plaintiff did not report to the medical department on October 9, 2019. (*See* ECF No. 22-2, PageID.168.) He "also failed to report to work at the Training Center on October 9, 10, 11, 14, and 15. [Plaintiff] did not appear for his light-duty work at the Training Center until October 18, 2019." (*Id.*) Plaintiff indicated during his deposition that he does not remember whether Dr. Vallabhaneni told him that he needed to report to the medical department each day for his wound to be redressed. (*See* ECF No. 25-3, PageID.511.) He testified that Dr. Vallabhaneni's orders "weren't really made clear to [him]." (*Id.* at PageID.519.)

## E. Plaintiff's Unserved Suspension

On October 16, 2019, Plaintiff was disciplined with a "five days' suspension for insubordination" or failure to follow a medical directive. (*Id.* at PageID.507, 519; *see* ECF No. 22-2, PageID.168; ECF No. 22-7, PageID.280; ECF No. 25-47, PageID.791.) The Declaration of Jennifer Hickey, Defendant's "Sr. Manager – Labor Relations" (ECF No. 22-2, PageID.166), indicates that Plaintiff received the suspension because

9

[o]n October 9, 2019, [Plaintiff], as he had on multiple occasions, contrary to the medical directive issued by the doctor at Great Lakes Works, failed to report to [Defendant's] medical department for treatment. . . . The suspension was issued pursuant to the Justice and Dignity clause of the CBA which allows the employee to remain on the job and not immediately serve a suspension. Seth Filthaut, Labor Relations Representative, and I were involved in the decision to issue discipline. Steve Kuipers, the process coordinator,[8] was not involved. [Plaintiff's] workers' compensation claim, race, and health condition played no role in the decision.

(*Id.* at PageID.168.)

Following a hearing on November 15, 2019,[9] the five-day suspension was changed to a one-day suspension. (*See id.*; ECF No. 25-3, PageID.526; ECF No. 25-47, PageID.790.) Plaintiff has not served any days of the suspension,[10] so he has not been "docked any pay for

_____

[8] Kuipers has worked for Defendant since January 2013 and has held the process coordinator position since August 2016. (*See* ECF No. 25-4, PageID.542.) His job duties "include pretty much anything . . . that's required to make the mill run," such as "[c]oordinating, scheduling its employees, [and] maintenance to be done with the maintenance team." (*Id.* at PageID.541–542.)

[9] Hickey's declaration indicates that Plaintiff "requested and was granted a hearing relevant to the discipline" under "Article 5, Section I of the CBA." (ECF No. 22-2, PageID.168.)

[10] Defendant indicates that Plaintiff has not served the suspension "under the terms of the CBA." (ECF No. 22, PageID.144.) Hickey's declaration states that "consistent with the Justice and Dignity clause of the CBA, because [Plaintiff] has

five days or for any days related to the discipline that was issued on October 16, 2019." (ECF No. 25-3, PageID.507; *see id.* at PageID.519, 526; ECF No. 22-2, PageID.168.)

### F. Plaintiff's Time at the Training Center

As noted, Plaintiff "appear[ed] for his light-duty work at the Training Center . . . [on] October 18, 2019." (ECF No. 22-2, PageID.168; *see* ECF No. 22, PageID.143.) At the training center, Plaintiff did no work; he "[s]at there with [his] leg propped up in a chair." (ECF No. 25-3, PageID.518.) He did that for "four hours a day for maybe a week," then for six hours, and later for eight hours. (*Id.*) Plaintiff agreed that the training center was "a clean work area." (*Id.* at PageID.519.) When he was there, he could sit down, ice his leg, and raise his left leg; however, elevating his leg at the training center "sent [him] back to the ER . . . because it wasn't being elevated properly which caused more pain and swelling." (*Id.*)

### G. Plaintiff's Return to Work at the Tandem Mill

After spending time at the training center following his injury, Plaintiff returned to the mill in January 2020 "once the issues with his

---

an active grievance protesting the suspension he has not served the 1-day suspension or any suspension." (ECF No. 22-2, PageID.168.)

restrictions were handled" and Kuipers "felt it was safe for [Plaintiff] to return to work." (ECF No. 25-4, PageID.557.) Dr. Vallabhaneni lifted Plaintiff's restrictions on January 29, 2020. (*See* ECF No. 22-23, PageID.395; ECF No. 25-22, PageID.704.) On January 30, 2020, Plaintiff returned to work at the tandem mill as a finisher. (*See* ECF No. 22-15, PageID.334; ECF No. 25-3, PageID.514, 518; ECF No. 25-23, PageID.706.) The next day, Plaintiff did not report any problems to Dr. Vallabhaneni. (*See id.*) Plaintiff remained working at the tandem mill and continues to work there. (*See* ECF No. 25-4, PageID.558.)

Plaintiff testified that he experienced "a lot of unfair treatment" when he returned to work after his injury. (ECF No. 25-3, PageID.513.) The "unfair treatment" includes that from the summer of 2020 to the present, certain foremen—Kuipers, Carla (last name unknown), Frank DeFrank, and Dave Bunting—are "targeting" Plaintiff because he has to do "odd jobs" and housekeeping work during his twelve-hour shift that the person who holds the same position on the other twelve-hour shift is not doing. (*Id.* at PageID.515.) Plaintiff testified that this treatment began at some point after May 2020. (*See id.*) That month, Plaintiff was brought back to work after being laid off in March 2020

12

due to the COVID-19 pandemic. (*See id.* at PageID.515–516; *see* ECF No. 22-2, PageID.169; ECF No. 22-15, PageID.333–334.)

When he returned to work in May 2020, Plaintiff was assigned the job of extra finisher because he had less seniority than the finisher on his shift. (*See* ECF No. 25-3, PageID.515.) Each twelve-hour shift[11] has one finisher and one extra finisher, and an extra finisher is only needed in certain circumstances.[12] (*Id.*; *see* ECF No. 25-4, PageID.562 ("There is an extra finisher function because there are some products we roll that needs [sic] to have two finishers present to inspect the strip.").) Kuipers indicated that "Assistant Finishers are assigned routine miscellaneous tasks to occupy their downtime" when "no finisher work is available for the Assistant Finisher to perform because the Finisher is handling all the available finisher work." (ECF No. 22-15, PageID.334.) Plaintiff testified that having to do housekeeping work—when the extra finisher

---

[11] Plaintiff's deposition testimony appears to indicate that before the pandemic, Defendant ran three eight-hour shifts and that since the pandemic, it runs two twelve-hour shifts. (*See* ECF No. 25-3, PageID.516, 534.)

[12] On May 18, 2022, Jeffery Crites was a "first finisher" and Plaintiff was a "second finisher." (ECF No. 25-6, PageID.594.) Crites stated during his deposition that "the first finisher is the one that does the core responsibilities for data entry and gathering samples and everything and the second finisher is more of an assist, yet there's [sic] still an inspector. They're equally as responsible for finding defects on the strip." (*Id.* at PageID.595.)

13

on the other shift is not doing this work—has no impact on his pay or benefits. (*See* ECF No. 25-3, PageID.516.) According to Kuipers, "Assistant Finishers are paid the same wage rate for Assistant Finisher tasks as they are for the miscellaneous tasks." (ECF No. 22-15, PageID.334.)

Plaintiff indicated during his deposition on April 26, 2022 that he was working an average of fifty-six hours per week in the same job classification under the CBA. (*See* ECF No. 25-3, PageID.505–506.) He stated that "since [he] returned to work with no restrictions," his hours "[ha]ve decreased due to the pandemic. . . . [T]hey decreased but they decreased for everyone in the department due to the pandemic." (*Id.* at PageID.505.) He agreed that the number of hours he is given is "consistent with an employee holding the job classification operator tech one" and that he is paid for the hours he works. (*Id.*) His pay rate has increased since October 4, 2019. (*See id.* at PageID.506.)

Plaintiff testified that his injury impacted his ability to do jobs at the mill because he believes he has post-traumatic stress disorder (PTSD) that makes it so that he is "not comfortable with going back inside of th[e] mill." (*Id.* at PageID.533.) He therefore believes that he

"can't rise in the ranks" because doing so requires him to go inside the mill to learn the assistant roller job. (*Id.*)

Plaintiff has not completed the training to be an assistant roller, so he never obtained that job title. (*See id.* at PageID.533–534; ECF No. 25-4, PageID.559; ECF No. 25-9, PageID.645.) He indicated during his deposition that he "currently" does not have the opportunity to be an assistant roller. (ECF No. 25-3, PageID.534.) However, Kuipers stated that he "ha[d] a discussion with [Plaintiff] on if he would like to complete training, which he turned down." (ECF No. 25-4, PageID.559.) Kuipers did not recall why Plaintiff declined the offer to complete the training to be an assistant roller. (*See id.*) Prior to October 4, 2019, Kuipers wanted Plaintiff to be an assistant roller. (*See* ECF No. 25-3, PageID.534, 536–537.) Plaintiff stated that this happened "[a]t some point, I can't recall when because that's . . . not the first time he asked me to . . . learn assistant roller because I previously declined," given that "I currently like the [operating technician level one or finisher] job that I do now." (*Id.* at PageID.537.)

Plaintiff indicated that there is a difference in pay between the "operator technician, level one" position and the assistant roller

position. (ECF No. 25-3, PageID.534; *see* ECF No. 25-4, PageID.560.) He also indicated that there "[a]bsolutely" is a difference in pay between the "operator technician, level one" position and the roller position. (ECF No. 25-3, PageID.534.) The roller position is "the highest level on the mill of hourly operators." (ECF No. 25-4, PageID.559.) It is the only position above the assistant roller position (*see* ECF No. 25-3, PageID.534), and a roller is paid more than an assistant roller. (*See* ECF No. 25-4, PageID.560.) There is one roller on each shift. (*See* ECF No. 25-3, PageID.534.)

According to Plaintiff, becoming an assistant roller would have put him "in line for th[e roller] position" "whenever rollers start retiring." (*Id.*) Plaintiff indicated that he is no longer "in line" for the roller position. (*Id.*) He identified the following change in who held the roller position since October 4, 2019: "Dave Cummings has retired, [and] Greg Barbeaux [sic] stepped in his place."[13] (*Id.* at PageID.536; *see* ECF No. 25-5, PageID.567.) Prior to becoming a roller, Barbeau was

---

[13] Barbeau testified that he became a roller in April 2019 (*see* ECF No. 25-5, PageID.569), which was before October 4, 2019.

already an assistant roller, and he has more seniority than Plaintiff.[14] (*See* ECF No. 25-3, PageID.536.) Aside from Cummings retiring and Barbeau becoming a roller, Plaintiff is not aware of other openings for a roller position since October 4, 2019.[15] (*See id.*) At the same time, Kuipers indicated that an individual does not have to be trained as an assistant roller to become a roller; "[t]here have been rollers that did not get trained as an assistant roller." (ECF No. 25-4, PageID.559.)

## H. Issues with the Tandem Mill Starting on its Own

### i. *How the Tandem Mill Started on October 4, 2019 is Unknown*

Plaintiff, Kuipers, and other individuals employed by Defendant do not know what caused the tandem mill to start on October 4, 2019, the date of Plaintiff's injury.

---

[14] Barbeau was hired by Defendant on September 11, 1995 and has worked for Defendant and on the tandem mill for "[a]lmost 27 years." (ECF No. 25-5, PageID.567–568, 570.)

[15] In fact, Ellison testified during his deposition on May 18, 2022 that he was "bumped down" from the roller position to the assistant roller position. (ECF No. 25-7, PageID.606.) Ellison stated that he was a roller

> [m]aybe two years ago. I was rolling consistently for probably five, six years and then we had a layoff back in the recession, and then when they called everybody back, they positioned everybody by seniority so I kind of lost my job there.

(*Id.*)

17

Plaintiff does not know how the mill started. (*See* ECF No. 25-3, PageID.520–521.) He does not claim that one of Defendant's managers deliberately told someone to start the mill when he was inside of it. (*See id.* at PageID.520.)

In addition, Kuipers does not know how (or from where) the mill received a signal to start. (*See id.* at PageID.521; ECF No. 25-4, PageID.548–549.) Kuipers testified that "[w]e do not know whether a button was pushed or not pushed." (ECF No. 25-4, PageID.549.)

Other individuals employed by Defendant also do not know how the mill started. Ellison, the roller on the day in question, is not aware of anyone pressing a button that would have started the coil in the mill. (*See* ECF No. 25-7, PageID.610.) Ellison stated that he has no information on how the mill started and that how that happened is "still a mystery, as far as I know." (*Id.* at PageID.612.) Barbeau, a roller who has worked on the tandem mill for approximately twenty-seven years (*see* ECF No. 25-5, PageID.569–570), does not know how the mill started. (*See id.* at PageID.574.) Bryant, Plaintiff's trainer, does not know how the mill started either. (*See* ECF No. 25-7, PageID.612.) Jeffery Crites, a finisher employed by Defendant since May 2003 (*see*

18

ECF No. 25-6, PageID.589), testified that to his knowledge, the issue of how the mill started with Plaintiff inside of it was "never resolved." (*Id.* at PageID.593.) Patrick Cole, a safety and industrial hygiene specialist who has worked for Defendant for ten years and who was part of the team that investigated Plaintiff's injury (*see* ECF No. 25-8, PageID.622–623), indicated that he does not know if someone intentionally started the mill when Plaintiff was inside of it and that he asked that question as part of his investigation and "[n]o one stated they started the mill." (*Id.* at PageID.623–624.) Cole does not know how the mill started, and he is not aware of a determination about how it started. (*See id.* at PageID.624.)

> ii.  *Complaints About the Tandem Mill Starting and Stopping on its Own*

Plaintiff and other employees testified that complaints were made about the tandem mill starting and stopping on its own.

Plaintiff testified that he witnessed the mill start on its own before he was injured. (*See* ECF No. 25-3, PageID.482.) He testified that he and other employees commonly complained about the mill starting and stopping on its own. (*See id.* at PageID.482–483, 488.) These complaints were made "face-to-face" and "mainly over the radio." (*Id.* at

19

PageID.488.) Plaintiff stated that he complained more than once between 2014 and 2017[16] and that he verbally complained to Kuipers; however, he could not recall a specific date on which he complained, how many times he complained, or which foremen he complained to other than Kuipers. (*See id.*) Plaintiff testified that Kuipers "knew that the mill start up and stop [sic] on its own." (*Id.*)

Yet when Kuipers was asked during his deposition whether he "ever received any complaints about the mill starting up on its own," he responded: "I know we've had complaints about the mill stopping on its own." (ECF No. 25-4, PageID.548.) Kuipers "do[es] not recall" hearing complaints over the radio that the mill started on its own. (*Id.*)

As for other employees at the mill, Crites—who has never seen the mill start on its own "with [his] own eyes"—indicated that he has heard complaints over the radio about the mill starting and stopping on its own. (*See* ECF No. 25-6, PageID.592–593, 599.) But Barbeau, Bryant, and Cole testified that they had not heard complaints about the mill

---

[16] Plaintiff testified that he made verbal complaints "over a span of a few years": between 2014 (when he began working on the mill) and 2017 (when he became a finisher). (ECF No. 25-3, PageID.488.) He testified that he complained "while I was on the mill . . . but once I moved down to finisher, I personally would have no reason to make those complaints because I'm not working directly on the mill and that's the job title I held was finisher before I got hurt." (*Id.*)

starting on its own. (*See* ECF No. 25-5, PageID.574; ECF No. 25-8, PageID.631; ECF No. 25-9, PageID.640.) In addition, Bryant has never heard anyone indicate that they informed Defendant's management about that issue. (*See* ECF No. 25-9, PageID.640.)

> ### iii.   *No Similar Incidents had Previously Occurred at the Tandem Mill*

Plaintiff, Kuipers, and other employees testified that an accident resembling Plaintiff's had not previously taken place at the tandem mill.

Plaintiff is unaware of prior accidents similar to the one he was involved in having happened at the tandem mill. (*See* ECF No. 25-3, PageID.520.) He never saw the mill start on its own when someone was inside of it. (*See id.* at PageID.483, 521.) He denied having "been in the mill before where it started without anyone giving a signal to [his] knowledge." (*Id.* at PageID.521.) Plaintiff indicated during his deposition that he is not claiming that management was present at a time when the mill started on its own with someone inside of it. (*See id.*) He stated that he "heard a story . . . that someone got hurt inside the mill but [he] wasn't working at [Defendant] U.S. Steel when this allege (sic) happened." (*Id.* at PageID.520.) Plaintiff does not know the details

21

regarding this incident, including the date on which it took place, but he thinks it would have happened before he started working for Defendant in December 2013 if it happened at all. (*See id.*)

Kuipers denied having "heard of the mill turning over while someone was inside of it," and he agreed that Plaintiff's incident was the first time this happened. (ECF No. 25-4, PageID.549.) Other employees—Ellison, Barbeau, and Bryant (who have between fifteen and twenty-seven years of experience working at the mill)—testified that Plaintiff's incident was "the first time" this kind of incident had taken place. (ECF No. 25-5, PageID.573; ECF No. 25-7, PageID.610; ECF No. 25-9, PageID.644.) Cole is not aware of "any other incidents" in which the mill started when someone was inside of it. (ECF No. 25-8, PageID.627.)

## I. Defendant's Safety Measures Before and After Plaintiff's Injury

The mill has a "disconnect switch" or a "lockout switch" located at "three stand" that, when activated, causes all five stands and the tension reel to become inoperable. (ECF No. 25-6, PageID.592; ECF No. 25-7, PageID.611; ECF No. 25-9, PageID.641–642.) Kuipers agreed during his deposition that activating the switch would prevent the mill

22

from running in the area where the operators are located. (*See* ECF No. 25-4, PageID.546.)

Before Plaintiff's accident, the disconnect switch was not used, and individuals such as Plaintiff and Bryant did not know about it or were not trained to use it before entering the mill. (*See id.* at PageID.550; ECF No. 25-7, PageID.608–609, 611–612; ECF No. 25-9, PageID.642–644.) Kuipers testified that the switch existed before Plaintiff's injury but that he "never s[aw] it used from the time [Kuipers] started [in January 2013] until the incident [involving Plaintiff] occurred." (ECF No. 25-4, PageID.542, 546.) Ellison indicated that the switch that de-energizes the mill was previously "inoperable" for years and was not working on the day Plaintiff was injured. (ECF No. 25-7, PageID.607–610.)

Prior to Plaintiff's incident, individuals would verbally communicate to the roller by radio that they were going into the mill. (*See* ECF No. 25-3, PageID.520; ECF No. 25-4, PageID.546; ECF No. 25-9, PageID.643.) The roller would "kick the mill out," which would

23

"[i]nhibit the thread."[17] (ECF No. 25-7 PageID.608.) The individual "would then go into the mill, do what was needed, and then the mill would be . . . set back up to be operational again." (ECF No. 25-4, PageID.546.) Kuipers is aware that before Plaintiff's injury, "employees would enter the mill without locking out and tagging out," and he did not say anything to them about this. (*Id.* at PageID.551.) Plaintiff indicated that he "followed the safety process" on October 4, 2019 by communicating with the roller before entering the mill.[18] (ECF No. 25-3, PageID.520.)

Defendant started to use the disconnect or lockout switch after Plaintiff's incident. (*See* ECF No. 25-4, PageID.546–547; ECF No. 25-6, PageID.590.) After the incident, the switch was "fixed" or "put . . . back

---

[17] Ellison stated that inhibiting the thread is different from using the disconnect switch because "the drives are still operable, but . . . if you inhibit the thread, you can't manually push the button and thread the mill. They can, but the mill won't thread." (ECF No. 25-7, PageID.609.) When someone "hit[s] the thread," "all the drives turn in unison." (*Id.* at PageID.610.)

[18] At the same time, Crites indicated that before Plaintiff was injured, the procedure to enter the mill was that "the [three stand] switch, the box and the flipper table are all mechanically locked out, physically locked out." (ECF No. 25-6, PageID.591.) Crites testified that he was shown how to use the switch "awhile ago." (*Id.* at PageID.591–592.) And Cole indicated that the investigation found that on the day Plaintiff was injured, all of the lockout/tagout procedures were not followed properly because the disconnect switch was not used (*see* ECF No. 25-8, PageID.625, 628) or Plaintiff "didn't lock out." (*Id.* at PageID.627.)

24

in use," and it then became "a process" to "use it any time [individuals] entered the mill." (ECF No. 25-7, PageID.609.) In addition to replacing and upgrading the switch and making it more accessible and visible (*see* ECF No. 25-5, PageID.575, 580), Defendant "reemphasized the need to log-out/tag-out/try-out to the whole crew." (*Id.* at PageID.578.) Bryant indicated that Defendant's employees were trained on how to use the switch and that he received written instructions that incorporate the new lockout/tagout process. (*See* ECF No. 25-9, PageID.641–642.) Ellison testified that after Plaintiff's incident (and at the time of Ellison's deposition on May 18, 2022), someone who has to enter the mill will communicate that over the radio, "and they'll pull the shut-off switch, which is at three stand, and that kicks out all the drives [so they become inoperable] and they put the lock on the shut-off switch and they enter and do what they've got to do." (ECF No. 25-7, PageID.607, 610; *see* ECF No. 25-6, PageID.592, 599.) Following Plaintiff's incident, the disconnect switch is activated "[a] couple times a day" for when people go in and out of the mill. (ECF No. 25-9, PageID.642.)

The "only difference" between the procedure for entering the mill before and after Plaintiff's injury is that mill workers have to "[a]ctivate

the switch and put [their] lock on. . . . [T]he communication is still there as far as letting everybody know [they]'re going in there." (ECF No. 25-7, PageID.610; *see* ECF No. 25-9, PageID.645 (Bryant testifying that the "only difference" between the old process and the new process is the requirement to engage the disconnect switch; "[e]verything else is the same").) It is now "standard practice" to use the disconnect switch. (ECF No. 25-7, PageID.612.)

## II.   Procedural History

A Workers' Compensation Agency form titled "Employer's Basic Report of Injury" was prepared on October 7, 2019. (ECF No. 22-17, PageID.356.) A form titled "Notice of Compensation Payments" indicates that Plaintiff received $7,978.77 for the period of October 13, 2019 through February 18, 2020. (ECF No. 22-26, PageID.410–413.)

On January 24, 2020, Plaintiff signed an EEOC (Equal Employment Opportunity Commission) charge against Defendant. (*See* ECF No. 25-3, PageID.494–495; ECF No. 25-70, PageID.874.) The EEOC's right-to-sue letter indicates that it was mailed on January 27, 2021. (*See* ECF No. 30, PageID.949.)

26

On April 26, 2021, Plaintiff filed the complaint in this case. (ECF No. 1.) In Count 1, Plaintiff asserts a claim of disability discrimination in violation of the ADA. (*See id.* at PageID.11–12.) In Count 2, Plaintiff asserts a claim of disability discrimination in violation of the PWDCRA. (*See id.* at PageID.12–13.) In Count 3, Plaintiff alleges retaliation in violation of the ADA. (*See id.* at PageID.13–14.) In Count 4, Plaintiff alleges retaliation in violation of the PWDCRA. (*See id.* at PageID.15–16.) In Count 5, Plaintiff asserts a failure to accommodate claim in violation of the ADA. (*See id.* at PageID.16–17.) In Count 6, Plaintiff asserts a failure to accommodate claim in violation of the PWDCRA. (*See id.* at PageID.17–18.) In Count 7, Plaintiff asserts a claim of race discrimination in violation of Title VII. (*See id.* at PageID.18–19.) In Count 8, Plaintiff asserts a claim of race discrimination in violation of the ELCRA. (*See id.* at PageID.20–21.) In Count 9, Plaintiff alleges retaliation in violation of the WDCA. (*See id.* at PageID.21–22.) In Count 10, Plaintiff asserts a claim of discrimination in violation of the WDCA. (*See id.* at PageID.22–23.) In Count 11, Plaintiff asserts a claim involving the WDCA's intentional tort exception. (*See id.* at PageID.23–24.) Plaintiff seeks monetary relief and "an order enjoining Defendant,

its agents, representatives and employees from further acts of discrimination and retaliation." (*Id.* at PageID.24–25.)

Defendant now seeks summary judgment on all claims and the dismissal of Plaintiff's complaint. (*See* ECF No. 22, PageID.128–129.) During the hearing on Defendant's motion, Plaintiff agreed to voluntarily dismiss his WDCA discrimination claim in Count 10.

## III.  Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## IV.   Analysis

## A. Plaintiff's Discrimination and/or Retaliation Claims Under the ADA, the PWDCRA, Title VII, the ELCRA, and the WDCA (Counts 1, 2, 3, 4, 7, 8, and 9)

In the complaint, Plaintiff asserts claims of disability discrimination under the ADA (Count 1) and the PWDCRA (Count 2), retaliation under the ADA (Count 3) and the PWDCRA (Count 4), race discrimination under Title VII (Count 7) and the ELCRA (Count 8), and retaliation under the WDCA (Count 9). Defendant is entitled to summary judgment on these claims because Plaintiff fails to show that he suffered an adverse employment action, which is a necessary element of a prima facie case of discrimination and retaliation under the statutes referenced above.[19]

---

[19] "To state a prima facie case of disability discrimination [under the ADA and PWDCRA]," Plaintiff must also show that "he is disabled or his employer regarded him as disabled." *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019). Here, the parties' arguments focus on whether Plaintiff is disabled, and they do not address whether Defendant "regarded him as disabled." *Id.* Based on the evidence before it, the Court is not convinced that Plaintiff has shown he is disabled. Even if the Court were to find that Plaintiff makes this showing, Plaintiff's ADA and PWDCRA discrimination claims fail because he does not show that he suffered an adverse employment action, as discussed above.

29

Because Plaintiff does not have direct evidence of discrimination and retaliation,[20] he "carries the initial burden of establishing a prima facie case of discrimination" and retaliation under "the *McDonnell Douglas* burden-shifting approach."[21] *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 419 (6th Cir. 2015) (ADA and PWDCRA disability discrimination); *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x

---

[20] The parties do not indicate in their filings whether they are considering direct or indirect evidence of discrimination and retaliation. They appear to consider indirect evidence based on the analysis presented in their filings. During the hearing on Defendant's summary judgment motion, Plaintiff indicated that he does not have direct evidence of race discrimination.

[21] Regarding Plaintiff's Title VII claim, this court has noted that

[a]nother threshold question for Title VII claims is whether they are brought under a mixed-motive or single-motive theory, because the analytical framework is different for each. A plaintiff must give notice that their claim is mixed-motive, either explicitly by naming it or implicitly by using the mixed-motive "motivating factor" test in their briefing. *Id.* [The plaintiff] has done neither, so the Court will proceed on the understanding that she is bringing single-motive Title VII claims. *See, e.g., Hashem-Younes v. Danou Enterprises Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009) ("The record is utterly silent as to mixed motives. . . . Therefore, the district court did not err in applying the *McDonnell Douglas/Burdine* framework, instead of mixed-motives analysis[.]").

*Ruddy v. Online Tech LLC*, No. 2:18-CV-12972-TGB-DRG, 2021 WL 807875, at *7–8 (E.D. Mich. Mar. 3, 2021). In this case, Plaintiff does not indicate that his Title VII claim is mixed-motive, so the Court "will proceed on the understanding that []he is bringing [a] single-motive Title VII claim[]," *id.*, and apply the *McDonnell Douglas* framework discussed above.

30

522, 528 (6th Cir. 2020) (ADA and PWDCRA retaliation); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (Title VII and ELCRA race discrimination); *Saulter v. Detroit Area Agency on Aging*, 562 F. App'x 346, 359 (6th Cir. 2014) (WDCA retaliation). To establish a prima facie case of discrimination and/or retaliation under the ADA, the PWDCRA, Title VII, the ELCRA, and the WDCA, a plaintiff must show that they suffered an adverse employment action. *See Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019) (ADA and PWDCRA disability discrimination); *Hurtt*, 627 F. App'x at 422 (ADA and PWDCRA retaliation); *White*, 533 F.3d at 391 (Title VII and ELCRA race discrimination); *McLaughlin v. City of Auburn Hills*, No. 19-cv-10271, 2020 WL 4530435, at *10 (E.D. Mich. Aug. 6, 2020) (WDCA retaliation).

For a discrimination claim under the ADA, the PWDCRA, Title VII, and the ELCRA,[22] "[a]n adverse employment action is 'a materially

---

[22] The Sixth Circuit reviews ADA and PWDCRA claims under the framework of the ADA, and it reviews Title VII and ELCRA claims under the framework of Title VII. *See Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 531 n.2 (6th Cir. 2020) ("Because [c]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases, we use Title VII to discuss both claims. . . . Similarly, because [t]he PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the

adverse change in the terms of [the employee's] employment.'"[23] *Hurtt*, 627 F. App'x at 419 (last alteration in original) (quoting *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). "An adverse employment action is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Garant v. Norfolk S. Ry. Co.*, 453 F. Supp. 3d 1027, 1038 (E.D. Mich. 2020) (quoting *White*,

---

plaintiff's PWDCRA claim, we use the ADA to discuss both claims." (internal quotation marks and citations omitted)). Given that the parties in this case do not dispute the Sixth Circuit's approach, throughout this opinion and order the Court uses the ADA to discuss Plaintiff's ADA and PWDCRA claims, and it uses Title VII to discuss Plaintiff's Title VII and ELCRA claims.

[23] This court has stated that "[t]he standards for . . . adverse job actions are the same under the ADA and PWDCRA as under Title VII and the ELCRA." *Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 697 (E.D. Mich. 2015) (citing *Vorachek v. Sec. Fed. Credit Union*, No. 07-15090, 2009 WL 4506440, at *6 (E.D. Mich. Dec. 1, 2009); *Burdett–Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 682–83 (6th Cir. 2014)). Moreover, the Sixth Circuit has determined that "Title VII cases . . . are instructive in interpreting the ADA." *Hoover v. Timken Co.*, 30 F. App'x 511, 512 (6th Cir. 2002) (citing *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)); *see Kocsis*, 97 F.3d at 885 (considering whether a plaintiff in an ADA case demonstrated a "materially adverse change in the terms of her employment" and "refer[ring] to analogous cases decided in the context of . . . sex discrimination, because cases involving . . . Title VII are instructive in cases involving the ADA"). Therefore, the Court considers ADA and Title VII cases in discussing the showing of an adverse employment action Plaintiff must make to establish a prima facie case of discrimination and/or retaliation under these statutes.

533 F.3d at 402; citing *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004), *aff'd* 548 U.S. 53 (2006)). The Sixth Circuit indicates that

> reassignments and position transfers "can qualify as adverse employment actions, particularly where they are accompanied by 'salary or work hour changes.'" *Spees*, 617 F.3d at 391 (quoting *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885–86 (6th Cir. 1996)). We also consider whether an action resulted in a plaintiff receiving "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation," along with other markers of prestige and desirability. *Id.* (quoting *Kocsis*, 97 F.3d at 886); *accord Burlington N. & Santa Fe Ry. Co.*, 364 F.3d at 803 (finding transfer was adverse employment action because, in part, "the [prior] position required more qualifications, which is an indication of prestige").

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 607–08 (6th Cir. 2019).

But the Sixth Circuit "has held that reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocsis*, 97 F.3d at 885 (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987)); *Howard v. Magoffin Cnty. Bd. of Educ.*, No. 12-5503, 2013 WL 362806, at *2 (6th Cir. Jan. 31, 2013). In addition, "the cases hold that a paid leave of

33

absence is not an adverse employment action." *McClane v. Genesee Cnty. Rd. Comm'n*, No. 18-CV-13774, 2020 WL 1323332, at *9 (E.D. Mich. Mar. 20, 2020) (citing *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3rd Cir. 2015); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004); *Spellman v. Ohio Dep't of Transp.*, 244 F. Supp. 3d 686, 702 (S.D. Ohio 2017)).

> For a retaliation claim under the ADA,
>
> the term "adverse employment action" encompasses more than just actions that affect "the terms, conditions or status of employment." *Hawkins*, 517 F.3d at 345. It includes any conduct "that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006)).

*Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021); *see Anderson v. Detroit Transportation Corp.*, 435 F. Supp. 3d 783, 798 (E.D. Mich. 2020) ("The PWDCRA and the ADA have the same elements of proof for retaliation claims." (citing *Aho v. Dept. of Corr.*, 263 Mich. App. 281, 287–291 (2004))). "Meeting this element is easier than meeting the adverse employment action element of a *prima facie* case of discrimination." *Redlin*, 921 F.3d at 614 (citing *Laster v. City of*

*Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014); *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69).

In reviewing a retaliation claim brought under the WDCA, this court has discussed the required showing of an adverse employment action as follows:

> The burden is upon the employee to establish an illegal adverse employment action by the employer. *Chiles*, . . . 238 Mich. App. at 470, 606 N.W.2d 398. An "adverse employment action" is an action which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789, 797–98 (6th Cir. 2004). A tangible adverse employment action in most cases inflicts direct economic harm. *Id.* However, an adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Russell v. Bronson Heating and Cooling*, 345 F. Supp. 2d 761, 786 (E.D. Mich. 2004). "It must be a condition such as 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities.'" *Id.*, (citing *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).

*Dortman v. ACO Hardware, Inc.*, 405 F. Supp. 2d 812, 823 (E.D. Mich. 2005) (granting summary judgment to the defendant because the

35

plaintiff "has not suffered an actionable adverse employment action. Without this essential element, Plaintiff cannot make out a *prima facie* claim of retaliation" under the WDCA.); *see Taylor v. AutoAlliance Int'l, Inc.*, No. 08-cv-11318, 2009 WL 2591533, at *9 (E.D. Mich. Aug. 24, 2009) ("[W]hat is most fatal to Plaintiff's WDCA claim is the absence of any type of adverse employment action, let alone one based on Plaintiff's exercise of her rights under the WDCA."). "Michigan caselaw has recognized both outright termination, *see Cuddington*, 298 Mich. App. at 277, and being 'laid off and not recalled,' see *Chiles*, 238 Mich. App. at 470, as adverse employment actions." *Mitchell v. Dore & Assocs. Contracting, Inc.*, No. 338701, 2018 WL 4576639, at *2 n.1 (Mich. Ct. App. Sept. 13, 2018).

Here, Plaintiff does not satisfy his burden of showing that he suffered an adverse employment action—not even under the more lenient standard pertaining to retaliation claims under the ADA. Plaintiff does not identify a materially adverse action that dissuaded him from making or supporting a charge of discrimination or that significantly changed the terms of his employment. He was not terminated, he does not identify a reassignment that substantially

altered his position, and his suspension was never served. In addition, Plaintiff does not show that he experienced an adverse change in compensation. "[T]hrough the workers' compensation process," he was paid his full salary when he was at the training center. (ECF No. 25-3, PageID.494; *see* ECF No. 22-26, PageID.410–413.) Plaintiff indicated during his deposition on April 26, 2022 that he was "currently" working an average of fifty-six hours per week. (ECF No. 25-3, PageID.505.) He stated that "since [he] returned to work with no restrictions," his hours "decreased but they decreased for everyone in the department due to the pandemic." (*Id.*) He agreed that the number of hours he is given is "consistent with an employee holding the job classification operator tech one"—the same job classification he held prior to his injury[24]—and that he is paid for the hours he works. (*Id.* at PageID.505–506.) His pay rate has increased since October 4, 2019. (*See id.* at PageID.506.)

In his response to Defendant's motion, Plaintiff cites to no evidence to show that he experienced an adverse employment action. He argues—without citing to the record—that the following "facts and

---

[24] In addition, Plaintiff worked as a finisher both before and after his injury. (*See* ECF No. 22-15, PageID.334; ECF No. 25-3, PageID.508, 514, 518; ECF No. 25-4, PageID.560; ECF No. 25-23, PageID.706.)

evidence create a genuine issue for the jury regarding . . . adverse employment action": (1) Defendant has deprived Plaintiff of the opportunity to become a roller, "the highest paid position on the mill," and (2) Defendant requires Plaintiff—but not other individuals—to do "menial jobs" while the mill is running that involve additional walking and that aggravate his injury. (ECF No. 25-1, PageID.457, 461.)

During the hearing on Defendant's summary judgment motion, Plaintiff argued that the adverse employment actions in this case also include Plaintiff's five-day suspension and Dr. Vallabhaneni not allowing Plaintiff to take his pain medication. In addition, Plaintiff argued that another adverse employment action was Defendant "sending [Plaintiff] back on the floor [in January 2020] and then having him do . . . menial jobs,"[25] which affected his ability to function on the mill, constituted a difference in treatment, and is "humiliating." Plaintiff appeared to argue that other adverse employment actions were

---

[25] The Court notes that Plaintiff returned to work post-injury in January 2020 and that he was assigned "odd jobs" at least five months after that. (ECF No. 25-3, PageID.515.) Plaintiff testified that he was assigned "odd jobs" starting in the summer of 2020, after he was "brought . . . back" to work in May 2020. (*Id.*) Plaintiff was recalled to work in May 2020 following layoffs in March 2020 due to the COVID-19 pandemic. (*See id.* at PageID.515–516; ECF No. 22-2, PageID.169; ECF No. 22-15, PageID.333–334.)

Defendant (1) requiring Plaintiff to come to work three days after the accident, and (2) not allowing Plaintiff to properly elevate his leg. At the same time, Plaintiff agreed during the hearing that he was not terminated, suspended, or subjected to a pay differential. Plaintiff's arguments fail. He does not show that Defendant took an adverse employment action.

Plaintiff does not establish that he suffered an adverse employment action because Defendant deprived him of the opportunity to become a roller. In his response (*see* ECF No. 25-1, PageID.456), Plaintiff cites to *Clay v. United Parcel Serv., Inc.*, a case in which the Sixth Circuit considered various Title VII claims and held that "the deprivation of increased compensation as the result of a failure to train constitutes an adverse employment action." 501 F.3d 695, 710 (6th Cir. 2007) (citing *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006)). Plaintiff does not explain how *Clay* applies. The Court finds it inapplicable because Plaintiff does not show that Defendant has deprived him of higher pay due to a failure to train.

In *Clay*, a plaintiff alleged that he had a confrontation with a manager after which the manager, "without explanation," stopped

providing a certain training to the plaintiff. *Id.* at 709. "As a result, [the plaintiff] continued to [work] for less money." *Id.* Unlike the plaintiff in *Clay*, Plaintiff was not deprived of training by his manager or employer. Plaintiff has not completed the training to be an assistant roller, but it is not because Defendant has not allowed or has suspended the training. Kuipers had a discussion with Plaintiff "on if he would like to complete [the assistant roller] training, which [Plaintiff] turned down." (ECF No. 25-4, PageID.559.) Prior to that conversation, Plaintiff "previously declined" Kuipers' offer for Plaintiff to train as an assistant roller because he "currently like[s] the [operating technician level one or finisher] job that [he] do[es] now." (ECF No. 25-3, PageID.537.) Plaintiff testified that his PTSD—not Defendant's actions or inactions—prevents him from learning the assistant roller job to "rise in the ranks." (*Id.* at PageID.533.) During the hearing on Defendant's motion, Plaintiff agreed that he was offered to be trained as an assistant roller but declined to continue the training.

Moreover, Plaintiff has not earned less money due to any failure of Defendant to train him. Plaintiff has not been deprived of higher pay because even if he had completed the assistant roller training, he would

40

not be occupying an assistant roller or roller position. Hickey's declaration states that

> [i]n accordance with the terms of the CBA, if there is an Assistant Roller opening, it will be placed for bid and the CBA's seniority provisions will apply as to who is selected for the position. There are currently no openings for an Assistant Roller and the last Assistant Roller opening was filled by a union member with more seniority than [Plaintiff].

(ECF No. 22-2, PageID.169–170.)

Regarding the availability of a roller position, Plaintiff is aware of only one opening for that position since October 4, 2019, and Barbeau—who was already an assistant roller and has more seniority than Plaintiff—took the position. (*See* ECF No. 25-3, PageID.536; *see* ECF No. 25-5, PageID.567.) Defendant indicates in its reply that

> [p]romotions are controlled by the seniority provisions of the CBA. For example, Ellison, a former Roller, testified that due to layoffs during the pandemic, he was repositioned from Roller to Assistant Roller based on his seniority. Thus, even if a roller position was available, there are other union members, like Ellison, with more seniority than Plaintiff, who would be promoted to that position, in accordance with the CBA's terms.

(ECF No. 27, PageID.895; *see* ECF No. 25-7, PageID.606.) Defendant similarly indicated during the hearing that Plaintiff has not been

41

denied a roller position, given that there has been no opening for such a position. Based on the evidence in the record, Plaintiff cannot show that he suffered an adverse employment action due to a failure to train that deprived him of increased compensation.

Plaintiff's argument about performing "menial jobs" also does not establish that he suffered an adverse employment action. Plaintiff does not demonstrate that being assigned housekeeping work is an adverse employment action because he and Kuipers indicated that Plaintiff having to do this type of work has no impact on his pay or benefits. (*See* ECF No. 25-3, PageID.516; ECF No. 22-15, PageID.334 ("Assistant Finishers are paid the same wage rate for Assistant Finisher tasks as they are for the miscellaneous tasks.").) Even if Plaintiff finds the housekeeping duties undesirable, "a plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *Mitchell*, 389 F.3d at 183 (citing *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002); *Henry v. Ohio Dep't of Mental Retardation & Dev. Disabilities*, 162 F. Supp. 2d 794, 801 (S.D. Ohio 2000)). Plaintiff states in his response that the "menial jobs" he

42

performs "require [him] to do a lot of walking, which aggravates [his] injury." (ECF No. 25-1, PageID.457.) But Plaintiff cites to no evidence that supports this assertion. Plaintiff also does not cite to any legal authority that demonstrates that having to do jobs that require a lot of walking and that aggravate an injury, and particularly one that has not led to further doctor's restrictions, is an adverse employment action.

In his response (*see id.* at PageID.456), Plaintiff cites to a Sixth Circuit case in which the plaintiff asserted a pregnancy discrimination claim: *Spees v. James Marine, Inc.*, 617 F.3d 380 (6th Cir. 2010). Plaintiff appears to reference language from *Spees* stating that the plaintiff's

> transfer [from a welding position] to [a position in] the tool room resulted in her working a more inconvenient shift in a position that was less challenging and that required fewer qualifications. Viewing this evidence collectively in [the plaintiff's] favor, a reasonable jury could find that her transfer to the tool room constituted an adverse employment action.

*Id.* at 392. Plaintiff does not explain how *Spees* applies. It appears to be inapplicable because Plaintiff does not argue that he was transferred to a position that resulted in him "working a more inconvenient shift in a position that was less challenging and that required fewer

43

qualifications." *Id.* Plaintiff worked as a finisher both before and after his injury. And as an extra finisher, Plaintiff is still performing the duties of a finisher.

Plaintiff also does not establish that his unserved suspension is an adverse employment action. Plaintiff does not indicate that the suspension prevented him from making or supporting a discrimination charge, and the unserved suspension did not materially alter the terms and conditions of his employment. *See Obnamia v. Shinseki*, 569 F. App'x 443, 446 (6th Cir. 2014) ("concur[ring] in the district court's judgment that the temporary suspension of driving responsibilities [during which the plaintiff continued to work with pay] falls short of an actionable adverse action because it effected no material change in the terms and conditions of [the plaintiff's] employment" (citing *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 462 (6th Cir. 2002); *Kocsis*, 97 F.3d at 885–87)). Plaintiff has not served his now-one-day suspension, so there has been no impact on his pay. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 667 (6th Cir. 2020) (finding that the defendant "subject[ing]" a plaintiff "to a five-day suspension *without* pay . . . was an adverse employment action" (emphasis added) (citing

44

*White*, 364 F.3d at 800–03)). Thus, Plaintiff's arguments regarding his suspension do not satisfy his burden to show that he suffered an adverse employment action. In fact, Plaintiff's counsel agreed during the hearing that the suspension cannot be considered an adverse employment action under Sixth Circuit case law, given that Plaintiff suffered no change in work hours, no change in pay, and no material consequence.

The remaining adverse employment actions identified by Plaintiff—being prevented from taking his pain medication,[26] having to come to work three days after the accident, and not being allowed to properly elevate his leg—do not meet the standard of an adverse employment action for purposes of establishing a prima facie case of discrimination or retaliation. In referencing these occurrences, Plaintiff does not demonstrate that Defendant's actions dissuaded him from making or supporting a charge of discrimination or that they significantly changed the terms of his employment.

---

[26] During the hearing on Defendant's motion, the Court rejected Plaintiff's argument that the medication incident constitutes an adverse employment action, given that the incident did not materially alter the terms of Plaintiff's employment and given that Plaintiff ended up taking the medication. The Court finds no reason to disturb that conclusion at this time.

Because Plaintiff does not establish that he suffered an adverse employment action, he fails to make out discrimination and/or retaliation claims under the ADA, the PWDCRA, Title VII, the ELCRA, and the WDCA. Accordingly, summary judgment is granted to Defendant on all of these claims (Counts 1, 2, 3, 4, 7, 8, and 9).

## B. Plaintiff's Failure to Accommodate Claims Under the ADA and the PWDCRA (Counts 5 and 6)

In the complaint, Plaintiff asserts a failure to accommodate claim under the ADA (Count 5)[27] and the PWDCRA (Count 6). Plaintiff

---

[27] As the Court indicated during the hearing, Plaintiff may have failed to exhaust his administrative remedies as to his failure to accommodate claim under the ADA. However, Defendant does not mention administrative exhaustion in its briefing. If the ADA's exhaustion requirement is jurisdictional, the Court must consider whether the requirement has been met even if the issue is not raised by the parties. *See Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019). If the exhaustion requirement is not jurisdictional, it can be waived or forfeited.

In light of recent Supreme Court precedent, the Court treats the ADA's exhaustion requirement as non-jurisdictional. In *Arbaugh v. Y&H Corp.*, the Supreme Court instructed that "courts should treat [a] restriction as nonjurisdictional in character" unless Congress clearly states otherwise. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006); *see also Galuten v. Williamson Cnty. Hosp. Dist.*, No. 21-5007, 2021 WL 3043275, at *4 (6th Cir. July 20, 2021) ("[A]fter *Arbaugh*, [the Sixth Circuit] generally look[s] for a clear statement before deeming a limitation 'jurisdictional.'"). More recently, the Supreme Court in *Fort Bend Cnty. v. Davis* applied *Arbaugh* to hold that Title VII's charge-filing requirement is non-jurisdictional. *Fort Bend Cnty.*, 139 S. Ct. at 1850–51.

Courts in the Sixth Circuit appear to apply the Supreme Court's holding in *Fort Bend* to other statutes' exhaustion requirements, including that of the ADA. *See Schaneville v. Publix Super Markets, Inc.*, No. 3:20-cv-01038, 2021 WL 5054106,

alleges in his ADA claim in Count 5 that he "timely made requests for an accommodation, and Defendant refused to afford Plaintiff with such accommodation." (ECF No. 1, PageID.17.) He alleges in his PWDCRA claim in Count 6 that he "timely submitted a written request for an accommodation, and Defendant refused to afford Plaintiff with such accommodation." (*Id.* at PageID.18.) In both counts, Plaintiff alleges that "Defendant was able to accommodate Plaintiff without undue hardship." (*Id.* at PageID.17–18.) Yet Plaintiff does not specify what his

---

at *5 & n.1 (M.D. Tenn. Nov. 1, 2021) (noting the Supreme Court's ruling in considering an ADA retaliation claim); *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 640 (E.D. Ky. 2021) (considering both Title VII's and the ADA's exhaustion requirements to be non-jurisdictional under *Fort Bend*); *Mitchell v. Brennan*, No. 2:18-cv-1385, 2019 WL 3416054, at *7 (S.D. Ohio July 29, 2019) (stating that *Fort Bend* "suggests that the exhaustion of administrative remedies is no longer a jurisdictional requirement" in declining to address the defendant's exhaustion argument related to a Rehabilitation Act claim). The Sixth Circuit has also expressed doubt that "the ADA's exhaustion requirement provides the type of clear statement necessary to make it 'jurisdictional' post-*Arbaugh*." *Galuten*, 2021 WL 3043275, at *4.

The Court follows these courts in viewing the ADA's exhaustion requirement as non-jurisdictional. Additionally, the Court notes that ADA claims are subject to the same procedures as Title VII claims. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e–5(f)(1). Because the ADA's exhaustion requirement is non-jurisdictional, it is not subject to "sua sponte enforcement" by the Court. *George v. Youngstown State Univ.*, 966 F.3d 446, 469 (6th Cir. 2020) ("Because the question of administrative exhaustion is nonjurisdictional, the district court erred by dismissing the claim in the face of the defendant's forfeiture for failing to raise the defense." (internal quotation marks and citation omitted) (considering Title VII cases and an ADA case)).

requests for an accommodation were, how he communicated the requests to Defendant, or the dates on which he made the requests.

In the record, which accommodations Plaintiff requested—and was denied—is unclear. Plaintiff testified that the first day Defendant denied his request for an accommodation was October 7, 2019. (*See* ECF No. 25-3, PageID.497.) He testified that Defendant denied him the following accommodations:

- Dr. Scott's and/or Dr. Jabbar's request that Plaintiff be taken off work for two weeks.[28] (*See id.* at PageID.497–498, 513, 519; ECF No. 1, PageID.3, 5.)

- Dr. Scott's request that Plaintiff elevate his leg above heart level and ice his leg for twenty minutes at a time. (*See* ECF No. 25-3, PageID.497–498.)

- Dr. Scott's request that Plaintiff work four hours and then six hours. (*See id.*)

In addition, during Kuipers' deposition, a medical restriction that Kuipers indicated could not be accommodated was discussed: fifteen-minute breaks after every two hours of work. (*See* ECF No. 25-4, PageID.554.) Even if the Court considers all of the possible

---

[28] One portion of Plaintiff's deposition transcript appears to indicate that Dr. Scott requested that Plaintiff take off work for two weeks. (*See* ECF No. 25-3, PageID.497–498.) Plaintiff later testified that he believed that Dr. Jabbar's "initial restrictions was [sic] for [him] to be off two weeks." (*Id.* at PageID.519.)

48

accommodations or restrictions listed above as forming the basis of Plaintiff's failure to accommodate claims, Plaintiff's claims fail because he does not satisfy his burden of establishing a prima facie case of failure to accommodate.

As noted, "[t]he PWDCRA 'substantially mirrors' the ADA, and a resolution of the ADA claims will 'generally, though not always, resolve the plaintiff's PWDCRA claim.'" *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012)). "Claims under the ADA and the PWDCRA are 'generally analyzed identically.'" *Id.* (quoting *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 497 (6th Cir. 2015)). Here, the parties do not argue that a separate analysis applies to each claim, so the Court evaluates both claims under the standard of the ADA. *See supra* note 22.

The Sixth Circuit instructs that

[i]n failure to accommodate cases, the plaintiff bears the initial burden of making out a prima facie case.[29] *See*

---

[29] The Sixth Circuit indicates that "[b]ecause failure to accommodate is listed in the Act's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination," *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (internal quotation

*Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (citing *Deister v. Auto Club Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016)). If the plaintiff makes this showing, then the burden shifts to the employer to show that the accommodation would cause undue hardship for the employer. *Cleveland v. Fed. Express Corp.*, 83 F. App'x 74, 79 (6th Cir. 2003) (quoting *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 781–82 (6th Cir. 1998)).

* * *

To establish a prima facie claim for failure to accommodate [under the ADA], "a plaintiff must show that (1) she was disabled within the meaning of the [the statute], (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation." *Kirilenko-Ison*, 974 F.3d at 669 (citing *Brumley*, 909 F.3d at 839).

*King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022); *Keogh v. Concentra Health Servs., Inc.*, 752 F. App'x 316, 326 (6th Cir. 2018). "As part of this prima facie case, the plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Keogh*, 752 F. App'x at 326

marks and citation omitted); *see Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019); *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) ("Claims that allege a failure to accommodate 'necessarily involve direct evidence.'" (quoting *Kleiber*, 485 F.3d at 868)).

50

(quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007)); *see Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) ("The plaintiff bears the initial burden of showing 'that an "accommodation" seems reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002))).

In this case, Plaintiff does not satisfy his initial burden of establishing a prima facie claim of failure to accommodate. Beneath a heading in his response titled "Affirmative Evidence Establishes Defendant Failed to Grant Reasonable Accommodation," Plaintiff states:

> Orthopedic surgeon gave [Plaintiff] work restrictions that included, among other things, elevation of his leg above heart level and later 15 minute breaks. [Plaintiff] testified that Dr. V[allabhaneni] did not let him raise his leg above heart level. As a result, Plaintiff testified that he experienced swelling in his left leg that sent him back to the emergency room. In January 2020, [Plaintiff] had work restrictions of 15 minute breaks his supervisor stated that Defendant could not accommodate these work restrictions. However, Kuipers testified that the Mill continues to run when employees take breaks.[30] Defendant's argument

---

[30] During the hearing, the Court asked Plaintiff to identify an exhibit that shows that the mill continues to run while other employees take breaks. Plaintiff did not point to such an exhibit. Defendant indicated during the hearing that the

regarding Plaintiff's request for accommodation is misplaced and it ignores the evidence. Defendant did not accommodate [Plaintiff's] request to heal from home per his discharge instructions form [sic] the emergency room after the injury. The work restrictions, plus Plaintiff's testimony and Kuiper's email create a genuine issue for the jury regarding a material element of the case regarding failure to accommodate.

(ECF No. 25-1, PageID.455–456.)

This language in Plaintiff's response is insufficient for Plaintiff to defeat Defendant's summary judgment motion. Plaintiff fails to demonstrate that the elements of a prima facie failure to accommodate claim are met; in fact, he does not even mention the elements or present arguments that address them—let alone show that each element is satisfied. *See, e.g., Green v. BakeMark USA, LLC*, 683 F. App'x 486, 491 (6th Cir. 2017) (concluding that the plaintiff "cannot succeed on [a] failure-to-accommodate claim because he has not shown that he was 'qualified' for [a certain] position within the meaning of the ADA"); *McDonald v. UAW-GM Ctr. for Hum. Res.*, 738 F. App'x 848, 853 (6th Cir. 2018) (finding that the plaintiff's ADA failure to accommodate claim "fails on th[e] last prong: she cannot show that [the defendant]

record evidence does not show that the mill continues to run while other employees take breaks, which is consistent with the Court's review of the record.

failed to provide her with the *necessary* accommodation" (emphasis in original)). Given that Plaintiff does not meet his initial burden of establishing a prima facie claim of failure to accommodate, he does not show that a reasonable jury could rule in his favor and that summary judgment should be denied to Defendant on his claims of failure to accommodate under the ADA and the PWDCRA.

Moreover, the portion of Plaintiff's response that discusses his failure to accommodate claims contains no citations to specific record evidence[31] or case law. In the Sixth Circuit,

> [i]t is not the district court's . . . duty to search through the record to develop a party's claims; the litigant must direct the court to evidence in support of its arguments before the court. *See Wardle v. Lexington–Fayette Urban County Gov't*, 45 Fed. Appx. 505, 509 (6th Cir. 2002) (per curiam) ("[A] district court is not required to search the record to determine whether genuine issues of material fact exist when the non-moving party has failed to point them out."); *Bickley v. Norfolk & W. Ry.*, No. 98–3286, 1999 WL 427026, at *4, 1999 U.S. App. LEXIS 13654, at *11 (6th Cir. June 15, 1999) ("To survive a motion for summary judgment, it is incumbent upon the nonmovant to point to specific evidence sufficient to show that a reasonable jury could find for the nonmovant."). Conclusory assertions will not by themselves

---

[31] The Court notes that during the hearing on Defendant's motion, Plaintiff could not point to a record that clearly demonstrates that he requested an accommodation involving fifteen-minute breaks.

do the trick—and that is all [Plaintiff] has done with respect
to []his claim[s].

*Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449

(6th Cir. 2008). Further, Plaintiff has not complied with his obligation

under Federal Rule of Civil Procedure 56(c)(1)(A), which requires that

> [a] party asserting that a fact cannot be or is genuinely
> disputed must support the assertion by . . . citing to
> particular parts of materials in the record, including
> depositions, documents, electronically stored information,
> affidavits or declarations, stipulations (including those made
> for purposes of the motion only), admissions, interrogatory
> answers, or other materials.

Fed. R. Civ. P. 56(c)(1)(A).

Because Plaintiff fails to meet his burden of establishing a prima

facie claim of failure to accommodate, the Court grants summary

judgment to Defendant on Plaintiff's failure to accommodate claims

under the ADA (Count 5) and the PWDCRA (Count 6).

## C. Plaintiff's Claim Involving the WDCA's Intentional Tort Exception (Count 11)

In the complaint, Plaintiff asserts a claim involving the WDCA's

intentional tort exception (Count 11). Plaintiff's claim is titled

"Defendant's Intentional and Deliberate Actions Violate the Michigan

Worker's Disability Compensation Act, MCL 418.131(1)." (ECF No. 1, PageID.23.) Plaintiff alleges in part that:

> 111.  Defendant intentionally and deliberately injured Plaintiff when it caused Plaintiff to enter the metal machine coil mill and Plaintiff suffered severe bodily harm and a near death incident.
>
> 112.  Defendant had actual knowledge that Plaintiff suffer [sic] injury, including, but not limited to, severe bodily harm or death, by intentionally causing him to operate the metal machine coil mill knowing that its safety features did not work[.]

(*See id.*) In its summary judgment motion, Defendant argues that "Plaintiff's claim is barred by the exclusive remedy provision of the WDCA because he cannot establish an intentional tort." (ECF No. 22, PageID.158.)

Under the WDCA,

> "worker's compensation is the exclusive remedy for all on-the-job injuries, except for injuries intentionally inflicted by the employer." *Gray v. Morley*, 460 Mich. 738, 596 N.W.2d 922, 924 (1999); *see also* Mich. Comp. Laws Ann. § 418.131(1). The WDCA's intentional-tort exception provides:
>
> > An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. An employer shall be deemed to have intended to injure if the employer had

55

> actual knowledge that an injury was certain to
> occur and willfully disregarded that knowledge.
>
> Mich. Comp. Laws Ann. § 418.131(1). . . .
>
> The exception's first sentence requires a showing that the
> employer "deliberately act[ed] or fail[ed] to act with the
> purpose of inflicting an injury on the employee." *Travis v.
> Dreis & Krump Mfg. Co.*, 453 Mich. 149, 551 N.W.2d 132,
> 142 (1996) (opinion of Boyle, J.); *id.* at 150 (opinion of Riley,
> J., concurring in the test established by the lead opinion).
> The second sentence provides a means of showing specific
> intent where there is no direct evidence of intent to injure,
> by demonstrating the employer "has actual knowledge that
> an injury is certain to occur, yet disregards that knowledge."
> *Id.* at 146.

*Barnes v. Sun Chem. Corp.*, 657 F. App'x 469, 471 (6th Cir. 2016); *see*

*Palazzola v. Karmazin Prod. Corp.*, 223 Mich. App. 141, 149 (1997)

("Recognizing that direct evidence of intent is often unavailable, . . . the

second sentence of the exception provides an alternative means of

proving an employer's intent to injure." (citing *Travis*, 453 Mich. at

172–73)). "A plaintiff has the burden of proving that his action falls

within the intentional tort exception to the Act's exclusive remedy

provision." *Hetterscheidt v. Aleris Specification Alloys, Inc.*, No. 1:15-cv-

18, 2016 WL 7638153, at *2 (W.D. Mich. Sept. 6, 2016) (citing *Gray*, 460

Mich. at 742–45; *Palazzola*, 223 Mich. App. at 146–51), *aff'd*, 687 F.

App'x 462 (6th Cir. 2017). "The issue of whether an act was an intentional tort shall be a question of law for the court." *Id.* (quoting Mich. Comp. Laws § 418.131(1)).

"In *Travis v Dreis and Krump Mfg Co*, 453 Mich 149, 180; 551 NW2d 132 (1996), [the Michigan] Supreme Court explained that MCL 418.131(1) provides 'a rigorous threshold for a claim of intentional tort.'" *Roach v. Detroit Cmty. Schs.*, No. 357448, 2022 WL 1194507, at *3 (Mich. Ct. App. Apr. 21, 2022). "Michigan law requires the plaintiff to demonstrate more than negligence—even gross or criminal negligence— by the employer." *Rosengarten v. MacSteel Monroe, Inc.*, 258 F. App'x 743, 746 (6th Cir. 2007). "Allegations that merely suggest the defendant acted recklessly or with deliberate indifference 'sound in gross negligence and are therefore insufficient to constitute an intentional tort within the meaning of the WDCA.'" *Roach*, 2022 WL 1194507, at *3 (quoting *Gray*, 460 Mich. at 744).

In its motion, Defendant argues that Plaintiff fails to establish an intentional tort through either direct or indirect evidence. (*See* ECF No. 22, PageID.158–161). In the portion of Plaintiff's response that addresses the intentional tort issue, Plaintiff does not cite to any

evidence in the record that shows that Defendant took a deliberate act and specifically intended to inflict an injury on him. (*See* ECF No. 25-1, PageID.462–464.) Moreover, Plaintiff stated during his deposition that he does not claim that one of Defendant's managers deliberately told someone to start the mill when he was inside of it. (*See* ECF No. 25-3, PageID.520.) During the hearing, Plaintiff stated that he believes circumstantial evidence exists regarding the intentional tort issue. Therefore, Plaintiff has not made a showing of an intentional tort through direct evidence, and the Court considers whether Plaintiff demonstrates with indirect or circumstantial evidence that Defendant committed an intentional tort.

When direct evidence of an intentional tort is lacking, an employee must "show that his employer (1) had 'actual knowledge'; (2) that an injury was 'certain to occur'; and (3) 'willfully disregarded that knowledge.'" *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 455 (6th Cir. 2002) (quoting Mich. Comp. Laws § 418.131(1); citing *Travis*, 453 Mich. at 173); *see Rosengarten*, 258 F. App'x at 746. Defendant argues in its motion that Plaintiff "woefully fails to meet this burden." (ECF No. 22, PageID.159.) The Court agrees.

58

### i.   Actual Knowledge

In its motion, Defendant argues that it

> did not have actual knowledge of an impending injury as the
> result of Plaintiff entering the Tandem Mill. Rather,
> [Defendant's] practice was for the employees to communicate
> with each other before an employee went into the mill so
> that the mill was immobile and to insert pins to protect
> against any further movement. It is undisputed that practice
> had worked safely for decades. Further, [Plaintiff] testified
> that he was not supposed to train as an Assistant Roller that
> day, but ended up in that role due to seniority, thus belying
> any inference that the injury was planned. (Ex. 5, Plt. at
> 126-127) As such, Plaintiff has failed to put forth any
> competent evidence that would establish that [Defendant]
> deliberately sent Plaintiff into the mill without any
> safeguards and then deliberately intended to injury [sic]
> him.

(*Id.* at PageID.159–160.)

In Michigan, a plaintiff using the alternative method to prove
intent to injure with indirect evidence must show actual knowledge. *See
Rosengarten*, 258 F. App'x at 746. The actual knowledge "element of
proof precludes liability based upon implied, imputed, or constructive
knowledge. Actual knowledge for a corporate employer can be
established by showing that a supervisory or managerial employee had
'actual knowledge that an injury would follow from what the employer

deliberately did or did not do.'" *Id.* (quoting *Palazzola*, 223 Mich. App. at 149).

Here, Plaintiff does not establish actual knowledge. Plaintiff fails to demonstrate that a supervisor or manager had actual knowledge that an injury would follow from Defendant's deliberate actions or inactions. *See id.* Even if a reasonable jury viewing the facts in a light most favorable to Plaintiff could conclude that Kuipers[32] knew the mill had previously started on its own (*see* ECF No. 25-3, PageID.488), "[a]n employer's knowledge of general risks is insufficient to establish an intentional tort." *Rosengarten*, 258 F. App'x at 746–47 (quoting *Herman v. City of Detroit*, 261 Mich. App. 141, 149 (2004)); *see House v. Johnson Controls, Inc.*, 248 F. App'x 645, 648–49 (6th Cir. 2007) ("Although the company was undeniably aware of the dangerousness of the situation, knowledge of the potential for the type of accident that occurred falls short of the kind of knowledge Michigan law requires." (citing *Oaks v. Twin City Foods, Inc.*, 198 Mich. App. 296, 296 (1992))).

In his response, Plaintiff argues that "Defendant cannot reasonably argue that it had no knowledge of its own safety switch.

---

[32] Based on Plaintiff's deposition testimony, Defendant's management appears to include Kuipers. (*See* ECF No. 25-3, PageID.514–515, 522.)

Defendant must have been aware that its failure to inform employees about the switch, and train them on the switch would result in a potentially fatal injury given the dangerous nature of the Mill and all the de-energize switches." (ECF No. 25-1, PageID.463.) But Plaintiff must show that Defendant had actual knowledge that *an injury* was certain to occur—not that it had knowledge of the safety switch. And Plaintiff's argument that Defendant "must have been aware" is misplaced because it does not "satisfy the strict standard of certainty— of *no doubt*—that the Michigan courts established in *Travis* and its progeny." *House*, 248 F. App'x at 649 (emphasis in original) (citing *Herman*, 261 Mich. App. at 148–50). "[K]nowledge of a general danger or likelihood of injury is insufficient to establish the intentional-tort exception." *Barnes*, 657 F. App'x at 476 (citing *Bagby v. Detroit Edison Co.*, 308 Mich. App. 488, 492–493 (2014)). "An employer's awareness of a dangerous condition, or knowledge that an accident is likely, does not constitute actual knowledge that an injury is certain to occur." *Id.* at 474 (quoting *Bagby*, 308 Mich. App. at 492–493); *see id.* (stating that "the required showing is not made 'by demonstrating an employer's awareness that a dangerous condition exist[ed], or that an employer

knew an accident was likely'" (alteration in original) (quoting *Johnson v. Detroit Edison Co.*, 288 Mich. App. 688, 697–98 (2010) (per curiam); citing *Upsher*, 285 F.3d at 455–56)).

> Plaintiff also argues that
>
> > [c]ontrary to Defendant's argument, [Plaintiff] does not have to show that Defendant deliberately sent him into the mill to almost die. Instead, [he] must show, and can show, that Defendant knew that an injury would follow if it did not require use of the safety switch before entering the mill or if it did not train its employees to use the switch before entering the mill. That is precisely what OSHA found[33] and that is precisely why they now require use of the switch and train there [sic] employees on its use. This is what the affirmative evidence shows.

(ECF No. 25-1, PageID.463–464.) Plaintiff does not cite to any evidence or case law that supports his position. The Michigan Court of Appeals has rejected a similar argument made by a plaintiff in a different case. That plaintiff

> argue[d] that [the defendant] Detroit Edison's failure to comply with Michigan Occupational Safety and Health Administration (MIOSHA) requirements, including

---

[33] Plaintiff does not identify where in the record these findings appear. (*See* ECF No. 25-1, PageID.463–464.) When Plaintiff was disciplined by Defendant, he might have filed a complaint with the Michigan Occupational Safety and Health Administration (MIOSHA) alleging discrimination. His testimony regarding this complaint is not entirely clear. (*See* ECF No. 25-3, PageID.526–528, 535.)

applicable lock-out/tagout regulations and regulations requiring insulated tools and other safety equipment, demonstrated that its supervisors were aware that employees were working within inches of components that could injure or kill them. Plaintiff relie[d] on the deposition testimony of Kenneth Precord, a Detroit Edison supervisor, admitting that mandatory MIOSHA regulations were not followed with respect to [the individual's] accident [at issue in the case] and that performing repetitive work on energized equipment without following mandatory safety requirements was "an accident waiting to happen."

*Allard v. Detroit Edison*, No. 281061, 2009 WL 997327, at *2 (Mich. Ct. App. Apr. 14, 2009). The Michigan Court of Appeals concluded that

[t]his evidence . . . fails to establish that a Detroit Edison supervisory or managerial employee had actual knowledge that an injury was certain to occur. *Travis, supra* at 173-174, 180; *Palazzola v. Karmazin Products Corp*, 223 Mich. App 141, 152; 565 NW2d 868 (1997). At most, this evidence shows that an injury was foreseeable. An employer's negligence in failing to "protect a person who might foreseeably be injured from an appreciable risk of harm" is insufficient to satisfy the requisites of MCL 418.131(1).

*Id.* In this case, Plaintiff does not demonstrate how any findings made by MIOSHA regarding the disconnect switch constitute evidence that Defendant's management "had actual knowledge that an injury was certain to occur." *Id.*

63

As the Sixth Circuit noted about the evidence in one of its cases, the evidence in this case

> of employer knowledge . . . is far less compelling than the evidence presented in several claims summarily rejected by the Michigan courts. In *Alexander*, the plaintiff was injured while cleaning pinch rollers when there had been four prior injuries from the rollers. *See Alexander v. Demmer Corp.*, No. 230417, 2002 WL 1921900, at *2 (Mich. Ct. App. Aug. 20, 2002) (per curiam). The Michigan Supreme Court summarily reversed the court of appeals and granted summary judgment for the employer. *Alexander*, 660 N.W.2d at 67. Similarly, in *Joliff v. Detroit City Dairy, Inc.*, 468 Mich. 919, 664 N.W.2d 211 (2003), the Michigan Supreme Court summarily granted summary judgment where the employer had twice ordered the employee—over his protest—to drive a pallet jack that had no brakes, *see Joliff v. Detroit City Dairy, Inc.*, No. 232530, 2002 WL 31012627, at *1–2 (Mich. Ct. App. Sept. 6, 2002); *see also Giles*, 660 N.W.2d at 73 (summarily granting summary judgment where the employee was instructed to use a torch to splice telephone wires in a hole with a natural gas line); *Menzel v. Light Metals Corp.*, 464 Mich. 853, 627 N.W.2d 601, 601 (2001) (summarily granting summary judgment where the employer knew that a press was double cycling and that a safety device had failed); *Gray v. Morley*, 460 Mich. 738, 596 N.W.2d 922, 923–25 (1999) (holding that there could be no intentional tort even where the employer swerved violently in his truck while the employee was in the bed in order to scare the plaintiff); *Bock v. General Motors Corp.*, 247 Mich. App. 705, 637 N.W.2d 825, 829–30 (2001) (per curiam) (holding that GM did not have actual knowledge of certain injury from employee exposure to highly concentrated

> chemicals because scientific experiments establishing
> injuries in animals establish only a probability of injury in
> humans).

*House*, 248 F. App'x at 649. Here, the mill had not previously started when someone was inside of it, and the reason why the mill started on the date of Plaintiff's incident remains unknown. (*See* ECF No. 25-3, PageID.483, 520–521; ECF No. 25-4, PageID.548–549; ECF No. 25-5, PageID.574; ECF No. 25-6, PageID.593; ECF No. 25-7, PageID.610, 612; ECF No. 25-8, PageID.623–624, 627.) Plaintiff indicated during his deposition that he does not claim that management was present at a time when the mill started on its own with someone inside of it. (*See* ECF No. 25-3, PageID.521.) Thus, Plaintiff does not present evidence that Defendant had actual knowledge that an injury was certain to occur for purposes of establishing an intentional tort under the WDCA.

### ii.   *Injury Certain to Occur*

Defendant argues that Plaintiff does not show that an injury was certain to occur because "no employee had been injured following this practice[34] before, and Plaintiff could have exercised his volition and not entered the mill in accordance with the terms of the CBA that allow

---

[34] "[T]his practice" presumably refers to Defendant's procedure for employees to enter the mill prior to Plaintiff's injury.

union employees to decline work they consider unsafe. (Ex. 26, CBA)."

(ECF No. 22, PageID.160.)

In proving an employer's intent to injure,

[t]he standard for establishing that an injury is "certain to occur" is "extremely high," and requires that "no doubt exists with regard to whether [injury] will occur." *Id.* at 143. Consequently, "the laws of probability . . . play no part in determining the certainty of injury," nor are "conclusory statements by experts" that merely "parrot[] the language of the legal test" without scientific or factual support sufficient to demonstrate certainty of injury. *Id.* at 143–44. Additionally, whether a similar incident has occurred in the past is not dispositive. *See id.* at 143.

A court may find that an injury was certain to occur when "an employer subjects an employee to a continuously operative dangerous condition that it knows will cause an injury, yet refrains from informing the employee about the dangerous condition so that he is unable to take steps to keep from being injured." *Id.* at 145. The Michigan Supreme Court has observed that "[a] continuously operative dangerous condition may form the basis of a claim under the intentional tort exception only if the employer *knows* the condition will cause an injury and refrains from informing the employee about it." *Giles v. Ameritech*, 468 Mich. 897, 660 N.W.2d 72, 73 (2003) (emphasis in original). "An employer's awareness of a dangerous condition, or knowledge that an accident is likely, does not constitute actual knowledge that an injury is certain to occur." *Bagby v. Detroit Edison Co.*, 308 Mich. App. 488, 865 N.W.2d 59, 62 (2014).

66

\* \* \*

> In addition, "[t]o be 'known' and 'certain,' an injury must
> spring directly from the employee's duties and the employee
> cannot have had the chance to exercise individual volition."
> *Bagby*, 865 N.W.2d at 63 (quoting *House v. Johnson
> Controls, Inc.*, 248 Fed. Appx. 645, 648 (6th Cir. 2007)). An
> injury is not certain where "'the employee makes a decision
> to act or not act in the presence of a known risk,' because the
> employer cannot know in advance what the employee's
> reaction will be and what steps he will take." *Id.* at 63–64
> (quoting *House*, 248 Fed. Appx. at 648); *see also Herman*, 680
> N.W.2d at 74, 77 ("The facts demonstrate that decedent's
> death was the result of decedent's momentary and tragic
> lapse in judgment, not the result of an intentional act by
> defendant.").

*Barnes*, 657 F. App'x at 474–475 (affirming a district court's finding

that an action was barred by the WDCA's exclusive remedy provision

and that the case did not fall within the WDCA's intentional tort

exception); *see Luce v. Kent Foundry Co.*, 316 Mich. App. 27, 34, (2016)

(stating that "[t]he existence of a dangerous condition does not mean an

injury is certain to occur" (quoting *Bagby*, 308 Mich. App. at 492–493;

citing *Herman*, 261 Mich. App. at 148; *Palazzola*, 223 Mich. App. at

150)).

In this case, Plaintiff does not show that an injury was certain to

occur based on the continuously operative dangerous condition doctrine.

Plaintiff does not establish that Defendant had knowledge of a dangerous condition that was certain to cause an injury but failed to inform Plaintiff about it. To the extent Plaintiff intends to argue that the doctrine applies, this argument lacks merit because Plaintiff had seen the mill start on its own, had spoken with Kuipers about this issue, and was among the employees who had complained. (*See* ECF No. 25-3, PageID.482–483, 488.) The Michigan Court of Appeals found in a different case that the plaintiff's "rel[iance] on the continuously operative dangerous condition doctrine to establish the existence of an intentional tort . . . [wa]s misplaced" because

> [t]o establish an intentional tort under that doctrine, plaintiff had to establish that the[] defendants had "knowledge of the condition and refrain[ed] from informing [plaintiff] about it." *Luce v Kent Foundry Co*, 316 Mich App 27, 35; 890 NW2d 908 (2016) (emphasis omitted). That is, "[t]he key is that the employee is left in the dark about the danger he or she will encounter and is therefore unable to take steps to keep from being injured." *Id.* (quotation marks and citation omitted). But in this case, plaintiff specifically alleged that he was aware of the hazardous conditions in his classroom and had complained to defendants about those conditions. Accordingly, any reliance by plaintiff on the continuously operative dangerous condition doctrine is inappropriate.

*Roach*, 2022 WL 1194507, at *4 (concluding that "the trial court properly held that the exclusive-remedy provision of the WDCA barred plaintiff's claims against [certain] defendants . . . and the intentional-tort exception under MCL 418.131(1) does not apply"). Like the plaintiff in the Michigan Court of Appeals case, Plaintiff—who was aware of the mill starting on its own and had complained about it to Kuipers—cannot rely on the continuously operative dangerous condition doctrine to show that Defendant committed an intentional tort.

Moreover, Defendant correctly points out in its motion that Plaintiff fails to show that an injury was certain to occur because (1) there was no history of a similar accident happening with the prior safety measures, and (2) Plaintiff knew the mill had previously started on its own but still entered the mill. (*See* ECF No. 22, PageID.160.) Plaintiff, Kuipers, and other employees of Defendant testified that they were not aware of a previous incident similar to the one Plaintiff was involved in or that Plaintiff's incident was the first of its kind. (*See* ECF No. 25-3, PageID.483, 520–521; ECF No. 25-4, PageID.549; ECF No. 25-5, PageID.573; ECF No. 25-7, PageID.610; ECF No. 25-8, PageID.627; ECF No. 25-9, PageID.644.) Plaintiff argues that he "thought he was

safe" by "follow[ing] what he thought was the safest way to enter the mill, pursuant to how he was trained." (ECF No. 25-1, PageID.464.) But Plaintiff knew the mill had started on its own, and he does not show that he had no opportunity to exercise individual volition when he entered the mill on the date of his injury. *See Barnes*, 657 F. App'x at 475. During the hearing, Plaintiff indicated that no one testified that Defendant knew Plaintiff's injury was certain to occur. Thus, Plaintiff does not provide evidence that an injury was certain to occur that would allow the Court to infer specific intent to injure.

### iii.   *Willfully Disregard*

Defendant argues in its motion that Plaintiff does not show that it "disregard[ed] actual knowledge that an injury is certain to occur" "[f]or the same reasons stated above." (ECF No. 22, PageID.161.)

Because Plaintiff does not satisfy the first two elements of the alternative method for proving intent to injure with indirect evidence—(1) actual knowledge (2) that an injury was certain to occur—the Court finds it unnecessary to address the third element requiring a showing of willful disregard.

In sum, Plaintiff does not show through indirect or circumstantial evidence that Defendant possessed the specific intent to injure. Plaintiff does not demonstrate that all of the necessary elements are satisfied: (1) that Defendant had actual knowledge, (2) that an injury was certain to occur, and (3) that Defendant willfully disregarded that knowledge. As a result, Plaintiff does not show that Defendant committed an intentional tort. Plaintiff does not meet his burden of proving that the case falls within the WDCA's intentional tort exception, and his "sole remedy should be under the WDCA." *Travis*, 453 Mich. at 183; *see Rosengarten*, 258 F. App'x at 745–48; *Roach*, 2022 WL 1194507, at *4. Summary judgment is therefore granted to Defendant on Plaintiff's claim involving the WDCA's intentional tort exception (Count 11).

## V.    Conclusion

For the reasons set forth above, the Court GRANTS Defendant's motion for summary judgment. (ECF No. 22.)

IT IS SO ORDERED.

Dated: July 6, 2023                          s/Judith E. Levy
       Ann Arbor, Michigan            JUDITH E. LEVY
                                      United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 6, 2023.

<u>s/Erica Parkin on behalf of</u>
WILLIAM BARKHOLZ
Case Manager